Argued April 16; affirmed April 28, 1931

# BARBER *v.* HARTLEY

(298 P. 226)

*Guy C. H. Corliss,* of Portland (Russell E. Sewall, of Portland, on the brief), for appellant.

*R. F. Peters,* of Hillsboro (George A. Pipes and E. J. Mendenhall, both of Portland, on the brief), for respondents.

RAND, J. On November 14, 1923, defendants G. S. Hartley and Margaret S. Hartley, his wife, mortgaged certain lands in Washington county to plaintiff to secure the payment of a promissory note for $1,750 given by them to plaintiff, which note was also executed by the defendant Bonser as an accommodation maker. Defendants defaulted in the payment of interest falling due under the terms of the note and also in failing to pay taxes on the land as provided in the mortgage. In the first complaint filed in this suit, the Hartleys only were named as defendants. After the filing of the first complaint and on March 15, 1929, Russell W. Sewall, who was acting as trustee for plaintiff, entered into a written agreement with the two Hartleys providing as follows:

"In consideration of Thirty-Five Dollars ($35.00) and other valuable considerations to G. S. Hartley and Margaret S. Hartley, his wife, in hand paid by Russell W. Sewall, receipt whereof is hereby acknowledged, the said G. S. Hartley and Margaret S. Hartley do hereby agree to sell and convey unto the said Russell W. Sewall those certain parcels of land particularly described in a certain mortgage made by the said G. S. Hartley and Margaret S. Hartley, his wife, to A. Barber, for $1,750.00, which mortgage was recorded May 19th, 1924, in book 96, page 275, Records of Mortgages of Washington county, Oregon, free and clear of all incumbrances excepting said mortgage and taxes, and said Hartleys agree to surrender and vacate said premises and the dwelling house and improvements situated thereon, on or before the 15th day of April, 1929, and deliver possession thereof to Russell W. Sewall not later than said date.

"Said Russell W. Sewall agrees to pay to said Margaret S. Hartley the sum of sixty-five dollars ($65.00) upon the surrender of the possession of said premises as aforesaid."

Pursuant to said contract, the Hartleys vacated the premises and surrendered possession thereof to Sewall and thereupon executed and delivered a deed to Sewall conveying said premises to him. The habendum clause and the covenant of warranty contained in the deed are as follows:

"To have and to hold, the above described and granted premises unto the said Russell W. Sewall, his heirs and assigns forever. And G. S. Hartley and Margaret S. Hartley, his wife, grantors above named do covenant to and with Russell W. Sewall, the above named grantee, his heirs and assigns that they are lawfully seized in fee simple of the above granted premises, that the above granted premises are free from all incumbrances, excepting a certain mortgage for $1,750.00 in favor of A. Barber, recorded May 19, 1924, in book 96, page 275, Records of Mortgages of Washington county, Oregon, and also excepting taxes, and that they will and their heirs, executors and administrators, shall warrant and forever defend the above granted premises, and every part and parcel thereof, against the lawful claims and demands of all persons whomsoever except as above mentioned."

Following the execution and delivery of this deed, plaintiff caused an amended complaint to be filed, joining Bonser as a defendant in the suit and seeking not only to foreclose the mortgage but also to obtain a personal judgment against all the defendants for the amount due under the note and also for the amount of the unpaid taxes.

Defendants answered the amended complaint, setting up the above transaction as a complete satisfaction and discharge of the note and mortgage and praying that the suit be dismissed. After trial of the cause in the court below, the learned trial court found and decreed that the conveyance was intended to operate as

a satisfaction of plaintiff's claim against the Hartleys and entered a decree that the suit be dismissed as to all the defendants with prejudice as to the Hartleys but without prejudice to an action at law against Bonser and without costs to either party. From this decree plaintiff has appealed.

Upon the trial of the cause, defendants gave testimony tending to show that prior to the making of the conveyance an agreement was entered into between the Hartleys and plaintiff, whereby it was agreed that the Hartleys should convey the lands to plaintiff and that plaintiff should release and discharge them from all obligations under the note and mortgage in consideration of such conveyance being made, and that plaintiff would pay them, in addition to discharging the mortgage, an amount equal to what he would have to pay for attorney's fees if the mortgage would have to be foreclosed. Upon this question Mrs. Hartley testified that plaintiff promised to "take the place for the mortgage and allow us enough cash—the same amount of cash that he would have to pay the lawyer for the foreclosure. Instead of paying it to the lawyer he would pay it to us, and that would give him a deed without having any trouble about it. * * * later he told us that it would be two hundred dollars he would have to pay the lawyer." She testified that, after the foreclosure papers were served, "we went up to Mr. Barber's home, after we were served with papers, and told him that we were served with the foreclosure papers, and he said that he didn't know anything about it; that he didn't know it was being foreclosed, and that his offer stood. That he would give us the two hundred dollars and take the place for the

mortgage.'' Later she testified that she went to the office of Mr. Russell E. Sewall, plaintiff's attorney, and that he told her:

"There were expenses incurred that he said amounted to one hundred dollars * * * we agreed to take the one hundred dollars and let him have the other one hundred dollars for his expenses as far as the foreclosure had gone, and that we would turn the place over to Mr. Barber on payment of this one hundred dollars * * * Q. What was that to do, when you turned—when you deeded the property over? A. That was to turn the property to Mr. Barber, and pay the mortgage and giving the property to Mr. Barber. To pay the mortgage and clean off the mortgage. Q. Then what did you do? A. After a while they sent for us, or told us to come in and sign the papers. We went in and— Q. Who do you mean by 'we'? A. I mean Mr. Hartley and I. We went in and signed the papers. Q. What papers did you sign? A. It was some sort of an agreement giving up the place that was to go to Mr. Barber in accordance with our agreement with Mr. Barber.''

On cross-examination she testified:

"I told him (Russell E. Sewall) that Mr. Barber had agreed to take the property over for the mortgage and pay us the amount that he would have to pay for the foreclosure.''

Her husband testified:

"We were to give them a quit-claim deed, and it was to cancel the whole cheese. The whole thing was to be cancelled, releasing Mr. Bonser and everything else. That is what we took this one hundred dollars for, and for nothing else. And we supposed we delivered a quit-claim deed to that place.''

Plaintiff, as a witness in his own behalf, testified on cross-examination:

"Q. Did you offer to pay Hartleys $200 for a deed? A. I offered $200 to get off the place. Q. What were they to give you for the $200? A. Get off the

place and give possession.  *  *  *  Q. What I asked is, when Mr. Hartley agreed to turn the premises over, and Mr. Sewall paid him the $100 for you, you were through with Hartley and didn't have anything more to do with Hartley? A. I had a mortgage on the property. Q. Were you still going to try to collect that mortgage from Hartleys? A. I don't think I can do it.''

Mr. Russell E. Sewall, plaintiff's attorney and father of the grantee named in the deed, testified:

''Q. Now the matter of this agreement between your son Russell and the Hartleys, and the matter of the deed from the Hartleys to your son Russell, was that a matter that was talked over with Mr. Barber in any way, or was it left to your discretion as his attorney? A. Mr. Barber left that with me. He left it with me to protect him on the loan, and I considered that was the best way to do it. Q. Why didn't you take the deed in Mr. Barber's name directly? A. Because I knew it would be a merger, and I tried to hold the note and mortgage alive and settle up with the Hartleys for their equity, so that we could get possession of the premises. And I drew that contract, just as it provides, that for the one hundred dollars they would deliver up possession and give a deed to my son Russell subject to the Barber mortgage. Q. That is to say the deed to your son Russell and the contract both contemplated the property was going to him subject to this mortgage? A. Yes, sir, absolutely. Q. For what purpose was the one hundred dollars paid by you on behalf of Mr. Barber? A. I think Mrs. Hartley stated it very fairly. There had been some talk of paying her two hundred dollars for the possesion, and the understanding was the sooner we got possession the sooner Mr. Bonser and Mr. Barber would be able to handle it. It was running up in interest and taxes. I don't know just when we talked to Mrs. Hartley about that, but at any rate nothing was done, and I went to California. Then they filed the forclosure. After we filed the foreclosure the Hartleys came in. She refreshes my mem-

ory. I said: 'I have gone to the expense of running down the abstract and bringing the foreclosure proceedings, and I ought to have one hundred dollars of that for my services. And I think you ought to have one hundred dollars.' She said that would be satisfactory. And so we drew that agreement where we paid her one hundred dollars for possession.  *  *  *''

On cross-examination Mr. Sewall testified:

"Q. Before the foreclosure was begun did you know that the Hartleys had any negotiations with Mr. Barber for a settlement? A. My recollection is that I did. That there was some talk about this $200 that Mrs. Hartley mentions, and I think it was all in my office. My recollection is that we on our side, Mr. Barber and myself, thought the $200 payment would be better than a foreclosure and a long right of redemption.  *  *  * Q. Now, at that time you were taking this property in trust for Barber and Bonser, and intended to relieve Hartley from any further liability? Isn't that a fact? A. Well, I didn't go into that. Nothing was said. We recognized the Hartleys had no financial liability. They were not released, still at the same time I knew that their responsibility was nothing. I didn't figure the way I handled it would make any difference to either Mr. Bonser or Mr. Barber. But there was no release. No legal release. Q. But it was your intention at that time to drop the foreclosure proceedings? A. Yes, my idea was that we would save the expense or any further proceedings, or delay, and we would have the property where we could handle it at a private sale. And, if you want to know my own judgment, from what Mr. Bonser told me, that we would be able to sell it to somebody and all get out. Q. You didn't tell Mr. Hartley or Mrs. Hartley at that time that the foreclosure would not be dropped? A. No, sir; I don't think I did. Nothing so far as the writings themselves. Those writings provide that the mortgage shall continue, the lien shall continue, and that is the reason why I wrote all these letters to Mr. Bonser. As soon as this happened Mr. Bonser dropped out of the picture and I could not get

hold of him any more. Q. I mean your agreement with the Hartleys. Did you explain to Mr. or Mrs. Hartley that after they had given this deed you might proceed with the foreclosure and they might have a deficiency judgment against them? A. No, sir; I can't say I did. I don't think I did. Q. Is it not a fact, Mr. Sewall, that the Hartleys were led to believe at that time that they were making a settlement so far as they were concerned? A. I heard what they said, and they may have had that understanding. But if they had read those papers—I make it a custom in my office to always read papers to parties when matters of this kind come in. That is a practice I have. I am quite sure in this case that was read. And that paper shows there is no disposition at all of the note and mortgage. That was to continue.''

■ Plaintiff made no objection to the introduction of this testimony in the court below and now contends for the first time in this court that the parol evidence of the Hartleys of the prior negotiations between the parties became merged in the contract and deed as executed by them and, therefore, that the foregoing testimony was inadmissible. ''When the question arises whether there has been a merger of the mortgage, to establish the intention of the parties with respect thereto evidence of the language and conduct of the parties and of the circumstances accompanying the transaction is competent'': 8 Encyc. of Evidence, p. 770. ''The evidence of intention against, or in favour of, merger may in the first place be either direct or presumptive, and parol evidence may be used.'' Fisher's Law of Mortgage (6th Ed.), § 1539. ''Parol evidence of all the surrounding circumstances of the transaction and of the property is therefore admissible, for the purpose of discovering the intention, or to show that a merger must take place, and also to show fraud,

but not to prove the intention directly'': Pomeroy's Equity Jurisp., vol. 2 (3d Ed.), § 792. See also *West-heimer v. Thompson,* 3 Idaho, 560 (32 P. 205) ; *Smith v. Roberts,* 91 N. Y. 470.

■■ The contract between the Hartleys and Sewall provides that the Hartleys ''in consideration of thirty-five dolars ($35) and other valuable considerations'' agree to sell and convey the mortgaged premises to Sewall ''free and clear of all incumbrances excepting said mortgage and taxes,'' and they also agree to vacate the premises and surrender possession thereof to Sewall on or before a stated date, and Sewall agrees to pay the further sum of $65 upon their surrender of possession. There is no declaration in the contract nor in the deed executed in pursuance of the contract of any intention to keep the mortgage alive. If Sewall had been a third party and not trustee for plaintiff, the title to the premises, when conveyed pursuant to the contract, would vest in him subject to the mortgage and he not having assumed the mortgage would not be personally liable, but his interest in the premises would be subject to foreclosure and sale. But in entering into the contract and in accepting a conveyance of the property he acted as trustee for the mortgagee, and, as such trustee, he held the legal title while his cestui que trust was the beneficial owner. There would be nothing in such relationship to prevent the interest of the mortgagee and the legal title from being kept distinct, if there had been a declaration of any intention to keep them separate and distinct, or if, because of some junior incumbrance or any intervening right or estate outstanding in a third person requiring that to be done for the protection of the mortgagee; but there was none. No principle is better settled than that a mort-

gagee, purchasing an equity of redemption, preserves his mortgage unmerged by taking a conveyance to a trustee with a declaration of his intention to that effect. *Bailey v. Richardson,* 9 Hare 728; Fisher's Law of Mortgage, 456. It is also equally well settled that where the equitable and legal estate are united in the same person, the former is merged in the latter unless it is made to appear that he had some beneficial interest in keeping the legal and equitable estates distinct: *Gardner, Adm., v. Astor,* 3 Johns. Ch. (N. Y.) 53 (8 Am. Dec. 465); *Forbes v. Moffatt,* 18 Vesey 384; *Watson v. Dundee M. & T. I. Co.,* 12 Or. 474 (8 P. 548); *Katz v. Obenchain,* 48 Or. 352 (85 P. 617, 120 Am. St. Rep. 821). In *Gardner v. Astor,* supra, the court said:

"In *Forbes v. Moffatt* (18 Vesey, 384) a mortgagee of land afterwards took the equity of redemption by will, and it was held to be a question of intention, declared or presumed, whether, in taking the estate, he meant the charge to sink into it, or to continue distinct from it. The charge, said the master of the rolls, had always been held to merge, when it was indifferent to the party in whom the interests had united, whether the charge should, or should not sink."

In *Watson v. Dundee M. & T. I. Co.,* supra, Mr. Justice LORD, speaking for the court, said:

"* * * It is only in those cases where it is perfectly indifferent to the party in whom the interests had united whether the charge or term should or should not subsist, that in equity the term is merged. (*Forbes v. Moffatt,* 18 Ves. Jr. 394.) But if the owner has an interest in keeping them distinct, or there is an intervening right, there will be no merger. 'The doctrine of merger,' said Bellows, C. J., 'springs from the fact that when the entire equitable and legal estates are united in the same person, there can be no occasion to keep them distinct, for ordinarily it could be of no use

to the owner to keep up a charge upon an estate of which he was seized in fee-simple; but if there is any outstanding, intervening title, the foundation of the merger does not exist, and as a matter of law, it is so declared.' (*Stanton v. Thompson,* 49 N. H. 272.) 'But if the owner of the legal and equitable title has an interest in keeping these titles distinct he has a right so to keep them, and the mortgage will not be extinguished.' (Wilde, J., in *Loud v. Lane,* 8 Met. [Mass.] 518.)''

■ Now, an examination of the deed given by the Hartleys to Sewall will show there was no declaration of an intention to prevent a merger. The warranty covenants that the premises are free from all incumbrances except this mortgage and taxes and warrants that they, the grantors, ''shall warrant and forever defend the above granted premises, and every part and parcel thereof, against the lawful claims and demands of all persons whomsoever except as above mentioned.'' The exception was the mortgage and the taxes and nothing else. As to all other incumbrances which might exist against the land, grantors warranted but as against the mortgage and taxes they specially covenanted that they would not warrant the land or any part of it. The clear meaning of this language is that if there was any other incumbrances upon the land the grantors would discharge them but as to the mortgage itself and the taxes they would not satisfy or discharge them or any part thereof. Under these covenants of warranty it seems to be clear that Sewall, in taking title to the mortgaged premises as trustee for the mortgagee, was to take the title with the mortgage satisfied and discharged. This, of course, includes all obligations growing out of the note or mortgage or either of them and

brings the case within the rule stated in 2 Washburn on Real Property (5th Ed.), p. 204, where the author says:

"* * * And it may be stated as a general principle, that although, where the mortgagee purchases in the equity, he thereby extinguishes his debt and mortgage, it will not be so regarded if he has been induced by fraud to give up his debt, or it is necessary for the protection of his interest that the estates should be kept distinct."

There was no pretense in this case that plaintiff was induced to take the conveyance in the name of his trustee by any fraudulent act or conduct upon the part of any one. Mr. Russell E. Sewall, who conducted the negotiations leading up to the conveyance on behalf of plaintiff, testified that the purpose of obtaining the conveyance was to avoid the necessity and expense of foreclosure, and also the delay which would be caused by the necessity of foreclosing the mortgage. If this was his purpose, it was not carried out for immediately following the making of the conveyance the complaint was amended to include Bonser as a party defendant and the forclosure proceedings were continued. Again, it clearly appears from the testimony that the Hartleys were induced to make the conveyance and to surrender their right of redemption by the promise and agreement of plaintiff, and nothing was said by Mr. Sewall to remove their belief that they were conveying the premises in consideration of the discharge of the mortgage and the extinguishment of their obligations to plaintiff. There was, as stated, no declaration contained either in the contract or deed of an intention upon the part of plaintiff that the absolute title he was acquiring by the deed and the lien of the mortgage should be kept distinct. On the contrary, the Hartleys

warranted to protect the title conveyed from all other incumbrances except the mortgage and the taxes which were then a charge upon the land, thereby exempting themselves from any obligation to pay either the note secured by the mortgage or the taxes then due. There were no junior incumbrances against the property, nor any intervening right of a third party. There was, therefore, no reason why a court of equity should interpose to prevent a merger or to hold that the mortgage was not extinguished and satisfied by the conveyance. It is true that Mr. Sewall testified that his object in obtaining the conveyance in the manner in which it was made was to prevent a merger, but if that effect could be given to the transaction it would be a fraud upon the Hartleys who had been induced to make the conveyance by plaintiff's promise that he would extinguish their obligations if they would convey the property to him; nor is it true, as contended for, that the sole purpose in obtaining the conveyance was to obtain a surrender of possession. The deed is an absolute deed with full covenants of warranty, specifying explicitly what the Hartleys warranted against and what they did not warrant against. The transaction itself determines the legal results which will follow and the case is not one where the undisclosed intention of Mr. Sewall to prevent a merger should control the effect of what the parties actually did in carrying out their agreement with plaintiff.

■ It is contended by plaintiff that he has an interest which entitles him to keep the two interests separate and distinct because of the fact that Bonser's name appears upon the note as one of the makers thereof and Bonser is solvent. The general rule is that "when the mortgagee acquires the equity of redemption in

whatever way, and whatever he does with his mortgage, he will be regarded as holding the legal and equitable titles separately, if his interest requires this severance": 2 Jones on Mortgages (8th Ed.), § 1109. But what interest does this refer to? Bonser did not sign the mortgage and it is admitted that he is only an accommodation maker. The interest referred to is an interest in the land, not an interest in some collateral matter such as this. The interest which the plaintiff had prior to the conveyance in the land arose from the mortgage itself and did not grow out of the fact that Bonser was primarily liable on the note. It follows that the Hartleys have been discharged from their obligations on the note by reason of their conveyances of the land and from this it follows that Bonser is likewise discharged under the provisions of sections 57-801 and 57-802, Oregon Code 1930, which provides in effect that a person secondarily liable on a negotiable instrument is discharged by the discharge of a prior party. See *Farmers' State Bank v. Forsstrom,* 89 Or. 97 (173 P. 935), and *Citizens' Bank v. Knudson,* 120 Or. 493 (252 P. 969.)

Under the decree appealed from the suit was dismissed as to all the defendants and it provided that the dismissal should be with prejudice as to the Hartleys but without prejudice as to the right of plaintiff to commence an action at law against Bonser. Since Bonser has not appealed, we are not at liberty to consider the correctness of the decree in holding that the dismissal of the suit should be without prejudice to the rights of plaintiff to commence an action at law against Bonser. As to that we express no opinion.

For the reasons stated, the decree of the lower court will be affirmed.

BEAN, C. J., ROSSMAN and KELLY, JJ., concur.